IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| GREGORY HAMMOND #407-534 | : |
| Plaintiff | : |
| v. | : CIVIL ACTION NO. JFM-13-1206 |
| RODERICK SOWERS<br>DOCTOR CLEM | : |
| | : |
| Defendants | |

## MEMORANDUM

Gregory Hammond (hereinafter "Hammond" or "plaintiff"), a Maryland Division of Correction ("DOC") prisoner housed at Eastern Correctional Institution ("ECI"), seeks money damages and injunctive relief[1] pursuant to 42 U.S.C. § 1983, claiming he was denied pain medication and outside recreation between his April 5 and April 19, 2013. In his complaint, Hammond states he suffers increasing headache and leg pain as the result of Multiple Sclerosis ("MS"). He names his treating physician Dr. Jason Clem and ECI Warden Roderick Sowers as defendants. The case is before the court for review of dispositive motions filed by each defendant (ECF Nos. 7 and 22). The motion filed by Clem, which is construed as a motion for summary judgment, is opposed. ECF Nos. 11 and 13. The dispositive motion filed by Sowers, also construed as a motion for summary judgment, is unopposed.[2] For reasons set forth herein, the dispositive motions shall be granted without a hearing. *See* Local Rule 105.6. (D. Md. 2011).

**Standard of Review**

---

[1] Hammond seeks "immediate release from custody." ECF No. 1, p. 4. For reasons apparent herein, the request is denied.

[2] Pursuant to the dictates of *Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975), plaintiff was notified that defendants had filed dispositive motions, the granting of which could result in the dismissal of his action. ECF No. 23. Plaintiff has chosen not to respond.

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.*, 477 U. S. 242, 247-48 (1986) (emphasis in original). "The party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.*, 346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)). The court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all inferences in her favor without weighing the evidence or assessing the witness' credibility." *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002). The court must, however, also abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat*, 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F.3d 630, 633 (4th

Cir. 2003) citing *Wilson v. Seiter*, 501 U.S. 294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry.

The subjective component requires "subjective recklessness" in the face of the serious medical condition. *See Farmer*, 511 U.S. at 839–40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F.3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F.3d 101, 105 (4th Cir. 1995) quoting *Farmer*, 511 U.S. at 844. If the requisite subjective knowledge is established, an official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted. *Farmer*, 511 U.S. at 844. Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time. *See Brown v. Harris*, 240 F.3d 383, 390 (4th Cir. 2000); citing *Liebe v. Norton*, 157 F.3d 574, 577 (8th Cir. 1998) (focus

must be on precautions actually taken in light of suicide risk, not those that could have been taken).

## Analysis

Hammond, age thirty-one, has been diagnosed with bipolar disease, depression, esophageal reflux and possible multiple sclerosis ("MS").[3] ECF No. 7, Medical Records, Ex. 1. On February 17, 2013, Hammond complained to Nurse Kimberley Carroll that he had experienced occasional headaches and blurry vision since November of 2012. Nurse Carroll referred Hammond for examination by a physician. *Id.,* Ex. 1, pp. 6-7. Physician's Assistant ("PA") Maryam Messforosh ordered blood and urinalysis testing that was completed on March 6, 2013. Messforosh noted that the optometry department recommended Hammond be seen by an ophthalmologist. *Id.,* Ex. 1, pp. 8, 10.

An MRI performed at Bon Secours Hospital on March 21, 2013, showed the presence of a focal brain lesion consistent with a demyelinating disease such as MS. *Id.,* p. 372. Opthalmologist Michael Summerfield, M.D., examined Hammond and referred him to ECI physician Dr. Mahboob Ashraf based on recent rapid deterioration of vision and bilateral optic neuropathy.[4] *Id*., pp. 21-23. On April 5, 2013, Hammond complained to Dr. Ashraf about rapidly deteriorating vision, severe headache, dizziness and neck pain. ECF No. 22, Ex. 1, Medical Records, pp. 2-9. Hammond was immediately taken by ambulance to the emergency

---

[3] Multiple sclerosis is an auto-immune disease in which the body's immune system destroys the protective sheath (myelin) that covers nerves, causing interference in communication between the brain, spinal cord, and other areas of the body. *See* http://www.mayoclinic.com/health/multiple-sclerosis/DS00188. As noted in the Clem Affidavit, ECF No. 7, Ex. 2, p. 2, the hallmark of MS is symptomatic episodes that can occur months or years apart and affect different anatomic locations. The disease may present with a wide spectrum of clinical manifestations including, but not limited to, numbness and parathesia, muscle cramping and/or spasticity, double vision, optic neuropathy, tremor and pain. The disease is incurable; treatment involves both immunomodulatory therapy ("IMT") for the underlying immune disorder and therapies to relieve or modify symptoms. IMT is directed toward reducing the frequency of relapses and slowing disease progression. *Id.*

[4] Optic neuropathy is a disease of the eye characterized by dysfunction or destruction of the optic nerve tissues. *See* http://medical-dictionary.thefreedictionary.com/optic+neuropathy..

4

room at Peninsula Regional Medical Center ("PRMC"). *Id*, pp. 2-10. Medical staff at PRMC conducted a CT scan which showed no acute abnormalities, but did show the presence of a pre-existing focal brain lesion consistent with multiple sclerosis or possibly Lyme disease.[5] *Id.; see also* p. 366. Plaintiff was discharged the same day with instructions to follow up with a neurologist for further evaluation and treatment. *Id.* at pp. 11-17. Upon his return to ECI, Hammond was admitted to the infirmary for 24-hour observation. Dr. Ashraf submitted a request for a neurology consult on Hammond's behalf and prescribed acetaminophen for pain. *Id*., pp.18-19, 25.

On April 6, 2013, Hammond was evaluated for the first time by Dr. Clem. *Id.,* pp. 34-35. He did not report leg pain or ineffective pain medication at that time, but complained later that evening to a nurse of headache and lower extremity pain for which acetaminophen was ineffective. *Id.* The following day, on April 7, 2013, PA Bruce Ford explained to Hammond that his pain medication options were limited due to contraindications from other medications, and that medication options would be explored during his consultation with a neurologist. *Id.,* pp. 44-45. Hammond was seen daily by Clem until April 12, 2013. Clem advised Hammond that he would be referred to psychiatric staff to determine whether he could discontinue his anti-depressant, Celexa.[6] During this time, Hammond reported further decline in vision and lower extremity weakness, but reported the acetaminophen was providing some relief. *Id.,* pp. 71-72, 75-76, 83-84. Clem advised Hammond to continue to use a cane or walker and informed him that a follow-up MRI of the head and spine had been approved. *Id.*

---

[5] Lyme disease is a tick-borne bacterial infection that can cause a broad spectrum of symptoms including neurologic impairment, fatigue and joint pain. *See* http://medical-dictionary.tefreedictionary.com/:Lyme+disease.

[6] Celexa is a selective serotonin reuptake inhibitor ("SSRI") used to treat depression. Many narcotic pain relievers and anti-inflammatory drugs cannot be used with Celexa. *See* http://www.drugs.com/celexa/html.

On April 12, 2013, Psychiatrist Vincent Siracusano, M.D., met with Hammond and recommended discontinuing Celexa with a follow-up evaluation in two weeks. *Id.,* Ex. 87-88. Clem continued to evaluate Hammond almost daily during infirmary rounds. *Id.,* pp. 101-102, 109-110, 122-123, 132-133. On April 19, 2013, Hammond was evaluated by RN Florence Enoch, who noted that the prescription for Ultram[7] had not yet arrived. Later that evening, Clem issued a prescription order for acetaminophen with codeine.[8] *Id.,* pp. 138-139. Hammond received his first dose of Ultram on April 20, 2013, but claimed it was ineffective. *Id.,* pp. 150-151. Hammond continued to report waxing and waning leg pain during his April 23, 2013 examination by Clem, who told him his Lyme titer test was positive and that a neurology evaluation remained pending. *Id.,* pp. 168-169.

On April 25, 2013, Clem noted Hammond continued to deteriorate. *Id.,* pp. 184. On April 29, 2013, Hammond told Clem that his vision and headaches were worsening and his medication was not effective. *Id.,* pp. 212-213. On April 30, 2013, Hammond told the night nurse he was suffering severe back and leg pain as well as numbness and tingling in the left leg. No swelling was found and pulses were present. *Id.,* pp. 214-219. Later that day, Clem told Hammond that his pain medications would be discontinued and new pain medications ordered. *Id.*, pp. 220-221.

Hammond underwent his second MRI at Bon Secours Hospital on May 1, 2013. Results showed no significant changes in the multifocal white matter found on the March 21, 2013 MRI. The findings were deemed consistent with a diagnosis of MS. No abnormality of the otpic nerves was detected. *Id.,* pp. 374-377.

---

[7] Ultram (tramadol) is a narcotic-lke pain reliever used to treat moderate to severe pain. *See* http://www.drugs.com/ultram.html.

[8] Codeine is an opiod (narcotic) medication used to treat mild to moderately severe pain. *See* http://www.drugs.com/codeine.html.

On May 3, 2013, Clem evaluated Hammond during infirmary rounds and prescribed Percocet,[9] which Hammond later reported was somewhat effective in controlling pain. *Id.,* pp. 231, 239, 247. On May 5, 2013, Hammond reported persistent numbness of the lower left leg and left arm. *Id.,* p. 247. Clem evaluated Hammond on May 6, 7, and 8, 2013 during infirmary rounds. *Id.,* pp. 255-256, 263-264, 271. 272. On May 8, 2013, Clem told Hammond that Neurologist Harjit Bajaj, M.D., evaluated the recent MRI and believed his symptoms were related to MS, but wanted to perform a lumbar puncture to rule out other possible causes. *Id.,* pp. 271-272.

On May 14, 2013, Clem evaluated Hammond for routine examination and pre-operative clearance for a scheduled lumbar puncture. *Id.,* pp. 318-319. On May 15, 2013, was transferred to Jessup Regional Infirmary. The following day, May 16, 2013, Hammond was sent to Bon Secours Hospital for evaluation by the neurologist and for the lumbar puncture (spinal tap). *Id.,* pp. 333-335, 350-351. A CT scan of the spine was normal. *Id.,* pp. 376-377. Dr. Bajaj was unable to perform the spinal tap due to Hammond's large size.[10] *Id.,* p. 350. If a later spinal tap confirmed MS, Dr. Bajaj recommended a maintenance program using Avonex[11] or Copaxone[12] injections. *Id.,* pp. 350-351. Based on the medical record, it appears that additional attempts to perform a spinal tap have been unsuccessful. *Id.,* pp. 335-349. Follow-up evaluation by Dr. Bajaj was scheduled for the summer of 2013, *id.,* pp 341, 349; neither the outcome of that

---

[9] Percocet is a combination of acetaminophen and oxycodone (an opiod pain reliever). *See* http://www.drugs.com/percocet.html.

[10] Hammond is 5'7" and weighs 268 pounds.

[11] Avonex is a form of protein called beta interferon that occurs naturally in the body. Interferons help fight viral infections. Avonex is used to treat those with relapsing forms of MS to slow the accumulation of placques that cause physical disability. *See* http://www.drugs.com.avonex.html.

[12] Copaxone (glatiramer) is a combination of four amino acids (proteins) that affect the immune system. It is used to treat MS and to prevent MS relapses. It does not cure MS, but can make relapses occur less often. *See* http://www.drugs.com/copaxone.html.

evaluation nor Hammond's treatment after May 31, 2013, is provided by the parties. From review of the docket, it appears that Hammond was returned to ECI during May or June of 2013, and that he is currently housed at that facility.

In his opposition response, Hammond alleges he complained about loss of eyesight, pain, and weakness in his legs "for months before getting any help," and that he did not get treatment until he began having headaches and nosebleeds, his "eyesight was less than 20%" and he "had to use a cane then a walker to get around." ECF No. 11, p. 1; ECF No. 13, p. 1. This allegation, however, is refuted by the medical record, which shows that health care providers recognized that Hammond was seriously ill and took steps to diagnose and treat his illness within weeks of his initial complaint of headaches and blurry vision made to Nurse Carroll on February 17, 2013. Far from acting with deliberate indifference, medical personnel at ECI moved to coordinate specialized care and testing with a degree of alacrity rarely apparent in prisoner civil rights cases.

Hammond also states that he has given consent for his mother to receive information about his condition, but "every time she calls, they refuse to give her any information." *Id.* This situation affects Hammond's mother – not Hammond – and will not be addressed here.

Hammond further notes in his opposition response received July 15, 2013, that a spinal tap had yet to be completed and that the high dose of steroids and Avonex recommended by the hospital neurologist was not provided once he returned to prison. ECF No. 13, pp. 1-2. As noted above, these medications were recommended by Dr. Bajaj if spinal tap analysis ruled out other causes of Hammond's symptoms (and thus confirmed a diagnosis of MS). If a final diagnosis has yet to be rendered and treatment not begun in the ensuing months, Hammond may file any appropriate legal action to compel such care. Based on the uncontroverted affidavits and medical record presented here, defendant Clem is entitled to summary judgment.

Defendant Sowers also is entitled to summary judgment. Under § 1983, liability is imposed on "any person who shall subject, or cause to be subjected, any person . . . to the deprivation of any rights...." 42 U.S.C. § 1983. The statute requires a showing of *personal* fault, whether based upon the defendant's own conduct or another's conduct in executing the defendant's policies or customs. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 (1978); *West v. Atkins*, 815 F.2d 993, 996 (4th Cir.1987), rev'd on other grounds, 487 U.S. 42 (1988) (no allegation of personal involvement relevant to the claimed deprivation); *Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir.1977) (in order for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, it must be "affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights ...") (quoting *Bennett v. Gravelle*, 323 F.Supp. 203, 214 (D.Md.1971), *aff'd*, 451 F.2d 1011 (4th Cir.1971)). Moreover, an individual cannot be held liable under 42 U.S.C. § 1983 under a theory of respondeat superior. *See Monell*, 436 U.S. at 690; *Love–Lane v. Martin*, 355 F.3d 766, 782 (4th Cir.2004) (no respondeat superior liability under § 1983). Defendant Sowers is not responsible for Hammond's medical care and is not alleged to have interfered with such care. Furthermore, it does not appear that he personally was responsible for denying Hammond "outside" recreation during the two week period in April of 2013 when Hammond was housed in ECI's medical infirmary.

For the aforementioned reasons, defendants' motions for summary judgment shall be granted and the case shall be closed. A separate order follows.

Date:  January 22, 2014            _____/s/_____
                                    J. Frederick Motz
                                    United States District Judge